Filed 1/29/15  Schwarzinger v. Reuter CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ISABELLA SCHWARZINGER,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DAVID REUTER,<br><br>    Defendant and Respondent. | A140153<br><br>(San Francisco City & County<br>Super. Ct. No. FPT-08-375918) |

The parties are the parents of a child born in 2008.  After extensive custody litigation in 2010, the court awarded joint legal custody with sole physical custody to appellant.  In 2012, appellant raised concerns that respondent might be sexually molesting the child.  An investigation by Child Protective Services (CPS) concluded the allegations were unfounded.  Respondent, asserting that appellant was harming the child by continuing to press her suspicions, successfully obtained a temporary order giving him sole legal and physical custody.  The present appeal is from the July 2013 order making this situation permanent.  Appellant contends the trial court denied her a fair trial, lacked a legal basis for the change in custody, made a number of erroneous evidentiary rulings, made findings unsupported by the evidence, and erroneously awarded respondent attorneys' fees.

We conclude that reversal is required because appellant was never permitted to obtain a judicial determination on the abuse allegations that triggered the CPS investigation.

## STATEMENT OF THE CASE AND FACTS

S.S. was born in July 2008. The parties were never married and the child was born after their relationship had ended. Appellant lives in San Francisco; respondent lives in Marin with his girlfriend, Birgit Wick. Respondent shares custody of his two children from a prior marriage, Emelia and Gabriel, with his former wife, Nicole Lamb.

After S.S. 's birth, the parties briefly followed an informal custody arrangement, until appellant asked the court to award her sole legal and physical custody, terminate respondent's overnight visits, change the child's hyphenated surname to appellant's alone, and order respondent to enter a domestic violence treatment program. Under a temporary order issued in August 2009, the parties shared legal custody and S.S. was with respondent for one weekday overnight and on Saturdays from 10:00 a.m. until 5:00 p.m.

At a four-day trial in 2010, at which appellant appeared in propria persona and respondent was represented by counsel, the parties addressed issues including respondent's anger,[1] driving safety,[2] wine consumption,[3] care of S.S. and his older

---

[1] The court's Statement of Decision following this trial referred to several incidents. On an occasion when respondent arrived to pick up the child and appellant said she was too sick for a visit, respondent "screamed and ranted at her and called the police to enforce his visit." When the child was an infant, respondent threatened to obtain breast milk from a hospital to substitute for appellant's breast milk. Respondent's former wife testified that during the breakup of the marriage, she called the police because of respondent's "volatile and erratic behavior," but she did not remember the incident in detail.

[2] Respondent had been found guilty of not using seat belts and talking on a cell phone while driving, had received a ticket for driving with a suspended license, and had a warrant issued for his non-appearance in court.

[3] Appellant's evidence indicated respondent and Wick averaged a half bottle per day; respondent's former girlfriend estimated three glasses per week, and Wick put it at four or five glasses per week. Respondent at one point was prescribed diazepam for anxiety; the last prescription was in 2008 and he testified he never mixed alcohol and prescription drugs and did not abuse either.

2

children,[4] and the effect of the current custody arrangements on S.S. [5] In its July 19, 2010, order, the court (Judge Chaitin) found that appellant was suspicious of the care respondent provided to the child but that there was no evidence he abused alcohol or drugs, presently had violent tendencies or had committed acts of domestic violence; there was evidence he was an appropriate and responsible father to his older children and no evidence he did not care similarly for S.S. The court noted that respondent had demonstrated excessive anger at the height of the breakup of his marriage but this was short-lived and he and his ex-wife were currently "best friends." The court found, however, that respondent "manifests excessive anger towards [appellant] and is intentionally provocative with her" and that respondent's "anger issues interfere with the best interests of the child." The court found that appellant had "extremely high parenting expectations" of herself and respondent which were not always reasonable, that she attempted to control respondent's parenting and her attempts were exacerbated by respondent's provocative behavior, and that while her care of the child was excellent, her behavior did not serve the best interests of the child "as demonstrated by her inflexibility and her desire to eliminate the respondent's name from the child's surname."

Finding that the parties ultimately would need to accommodate each other's parenting style to serve the child's best interests, that the structure of the court's order should lessen the conflict and that it was anticipated respondent would spend increased time with the child in the future, the court ordered shared legal custody with appellant to have sole physical custody and respondent to have one 24-hour visit and one visit of three and a half hours each week. The court set forth detailed orders to govern the parties' behavior and decision-making.

---

[4] Respondent presented evidence that his older children have special needs requiring attentive supervision of their diet. His ex-wife, an ex-girlfriend, and respondent's current live-in girlfriend testified that respondent provided diligent and responsible care for the children.

[5] Appellant testified that respondent's overnight visits interfered with her breastfeeding the child. Respondent testified that much of the time he has the child is spent in the car driving between Marin and San Francisco.

A year later, on August 3, 2011, after a hearing at which it heard testimony from the parties and Wick, and both parties were represented by counsel, the court (Judge Sing) entered a permanent custody and visitation order increasing respondent's visitation to two overnights per week. The court found that respondent had "proved himself to be a responsible and caring parent to both his older children and S.S. ," and that appellant was suspicious of respondent but her suspicion was not supported by the evidence presented. The court stated its concern "that this anxiety has been noted by the child and is damaging to the child." The court's order established a schedule for summer vacations and holidays and continued Judge Chaitin's order in effect except as modified by the permanent order.

The sexual abuse allegations arose in July 2012. According to appellant, on July 22, 2012, S.S. kissed her "with her mouth open," said that respondent kissed her and her half siblings that way, and said that respondent and Gabriel touch each other's penises and that respondent sexually touched Wick and Rose, the caretaker, as well as Emelia.[6]

---

[6] Appellant wrote in a journal, under the date July 22, 2012, "S.S.kissed me again with her mouth open. I asked her if her papa kissed her that way, and she said yes, but not this time . . . last time 'on Tuesday'. . . and then again that he only kisses G&E that way. I asked her if she still tickles him, and she said no, he tickles himself . . . and she showed me how (at the head of the penis). Later on I asked her if papa ever touched G&E and she said yes, he touches Emelia's clitoris ('Kitzler'), and that Emelia says stop but he doesn't stop, and Emelia says 'Papa please stop' and he doesn't. He only stops when she (S.S. ) told him to stop . . . and Emelia said 'Thank You' to S.S. I asked her he ever hurt Emelia and she said yes, but she didn't say . . . but she had an expression on her face (which S.S.imitated to show me). She told me that Gabriel & papa touch each other and she showed me how . . . by gently slapping the top and bottom of the penis' head. I asked if 'pee' (or anything else) ever came out of the penis and she said no . . . but papa has to go to the bathroom then and he sometimes can't make it. I asked when he does that and she says in the morning . . . and that Birgit is still sleeping in the other room when he does that. Emelia sleeps at the top, Gabriel in the middle, and S.S.at the bottom. S.S.also said that papa touches everyone's clitoris . . . Birgit's, Rose's, and Emelia's. I was surprised to hear about Rose and asked her if she really saw that and she said yes. Where? In papa's bedroom. I asked if they kissed first and she said no, they touched each other first and then they kissed . . . and they were naked. Papa told S.S.not to say anything to mama and he gave her balloons . . . 'but the green and yellow one broke soon.' G&E saw that, too (with papa and Rose)."

Appellant sought resources from S.S. 's preschool and contacted Children, Youth and Families Outpatient Services (CYFOS) to schedule an appointment. Appellant did not want CPS contacted at this point, but the therapist she spoke with, Mona El-Halawani, said this had to be done because she was a mandatory reporter.

San Francisco Family and Children's Services (CPS) Protective Services Worker (PSW) Timothy Laird contacted appellant on July 23, 2012. She told him about S.S. 's statements, as well as that S.S. previously had said in July 2010, that respondent was hitting her and "touching her private," in August 2011, that respondent had her "tickle his penis," and in 2012, that respondent French kissed her, then that he only French kissed Gabriel. Appellant told Laird that when she and respondent were together, he abused valium and alcohol and she believed he still did so.

Appellant emailed to Laird a number of documents including a " 'diary' with notes of S.S. 's statements and conditions"[7] and documents suggesting past violent conduct and drug use by respondent. [8]

---

[7] This five and a half page diary contains entries from May 22, 2010, through July 22, 2012, ranging from a few words to a paragraph in length, and describing matters from what S.S.ate and who changed her diaper to reports of Wick hitting her, respondent touching her "privates" and the report that triggered the CPS investigation (see fn. 7, *ante*).

[8] These documents were a 2005 report from when respondent's ex-wife called 911 in Oregon; a 2005 temporary restraining order application filed by respondent's former girlfriend; a 2009 email from that ex-girlfriend to appellant stating that she remembered respondent buying a knife as a Christmas present for Gabriel when he was four years old; that he told her he had killed a man, woman, and child; that he described ways to kill his ex-wife and make it look like an accident and thought of ways to kidnap his children; and that he was "a total looser [*sic*] preying on women"; a transcript reflecting respondent's statement to the court that he had no history of abuse and his last valium prescription was refilled in 2007, and medical records showing ongoing prescriptions through July 2008 and a 2008 prescription for Zolpidem; testimony from respondent's ex-wife about his having told her he had "maimed someone overseas" and her concerns about leaving the children with him because he combined medication with alcohol; a statement from a friend of appellant's about observations of respondent's use of valium and alcohol and his temper; and respondent's history of driving without a valid driver's license.

A forensic interview was arranged for S.S. with Marin CPS, because the alleged abuse occurred in Marin.  The interview was conducted by PSW Juan Funes; Laird observed from another room with PSW Hadar Hartshorn, who had been assigned to investigate the allegations concerning respondent's older children, District Attorney Inspector John George, Sausalito Police Detective Brian Mather, the director of the facility where the interviews were conducted, Michael Grogin, and Deputy District Attorney Nicole Pantaleo.  In his summary of the interview, Laird noted that S.S. was "quite verbal" and was able to distinguish between a truth and a lie.  She said she did not know why she was there to talk to him and said "no" when asked if her mother was worried that something might have happened to her.  She reported that her daddy comes to her bed naked and "squishes" her, and she does not like this.[9]  On a picture of a girl, she was able to correctly identify body parts including eye, nose, head, belly button, and "private (i.e. vagina)."  She was not able to answer the question whether her brother and sister were there when she was at her father's house.  It was agreed to continue the interview on another day, and appellant agreed not to ask S.S. any further questions about the alleged abuse in order to avoid tainting the interview.

The following night, appellant sent an email to Laird, Detective Mather and Grogin stating that she had been encouraging S.S. to tell the interviewer everything she had told appellant, that S.S. revealed respondent had been "doing those things" to her as well as the other children, and that when she asked how respondent touched her, S.S. put her finger inside her vagina.  The email concluded, "Regardless of whether or not Gabriel and Emelia will back up S.S.'s story, I NEED YOU TO MAKE SURE THAT S.S. DOES NOT HAVE TO GO BACK TO HIM EVER!!!"[10]

---

[9] After viewing recordings of the three children's interviews, Barovsky reported that Emelia and Gabriel both related that when S.S. is there, respondent lies down with her at bedtime and that he wears boxers and a tee shirt to bed.

[10] In full, the email read, "While I've not talked with S.S. about the things she already shared with me, I have been telling her that Juan is our friend and have been encouraging her to tell Juan everything she told me.  She told me she is scared to talk (she said she would talk if I was in the room with her which I told her is not possible as

6

Gabriel and Emelia were each interviewed on July 26; each interview lasted about 45 minutes, both children appeared very comfortable during the interviews, and neither disclosed any abuse. Their mother had no concerns about respondent sexually abusing the children.

Just prior to the continuation of S.S. 's interview, Detective Mather reported that appellant had told him she wanted to move back to Austria with S.S. During the interview, S.S. said she would not tell any lies and shook her head when asked if anyone had told her what to say. S.S. said she got sad when respondent "squished" her, then stayed silent when asked to say more about this. Funes asked if she wanted to go to respondent's house and she said no, then stayed silent when asked why; she said it made her feel sad to go to respondent's house but did not answer when asked why. S.S. said her mother did not like her father and her father liked her mother. Funes asked if her parents gave her kisses and she said yes; he asked where respondent kissed her and she said he "licks" her. Funes showed S.S. a picture of a girl and asked where respondent kissed her and she pointed to the girl's mouth; asked if he kissed her elsewhere she said no. Asked if there was anything she wanted Funes to tell respondent, she said she wanted him to stop tickling her and pointed to her neck.

---

she needs to tell Juan herself without me being there), but can't give any reasoning why she is scared. She did tell me that papa tells her every morning and evening (when she is with him) that mama doesn't like/love her and that she doesn't like/love mama. (I told her no matter what she does and no matter what somebody does to her, I'll always love her.) During the Juan is our friend talk, it came out that papa has been doing those things to her, too, and not only to Gabriel and Emelia. She knows that papa doesn't listen to mama and by experience she already knows that papa doesn't listen to her either (regardless whether it's this matter or other insignificant matters), and I told her that papa WILL listen to Juan and that if Juan tells papa to stop papa will listen and he will stop. When we went to bed, I did ask her though to show me how papa touches her and she put her finger inside her vagina. Regardless of whether or not Gabriel and Emelia will back up S.S. 's story, I NEED YOU TO MAKE SURE THAT S.S.DOES NOT HAVE TO GO BACK TO HIM EVER!!!"

Laird and Mather met with appellant after the interview and told her that none of the three children had disclosed abuse. She said if what S.S. said in the interviews was true she was relieved.

Laird called respondent and told him it had been determined that the allegations were unfounded, then met with him. Respondent was very upset about the report, saying appellant had coached S.S. and he was "deeply disturbed" by what she had done. Respondent told Laird there had been four straight years of litigation, with "seven judges involved and two trials over mother's false allegations" and said he was afraid appellant would make more sexual abuse allegations in the future.

On August 10, 2012, respondent filed an application for an ex parte hearing, seeking an immediate change in custody because appellant had made false allegations of him sexually molesting his children and was trying to brainwash S.S. into believing she was being abused in his home. Respondent declared that he had not given notice of the application to appellant because he believed she was a flight risk in that she was from Austria, traveled there every year, had the child's passport and had minimal ties to San Francisco, and he believed there was a strong likelihood she would flee the jurisdiction rather than give him custody.

Respondent's declaration stated that since S.S.'s birth, appellant had "relentlessly pursued [him] through the legal system," repeatedly attempting to eliminate or minimize his relationship with S.S. and accusing him "of a wide range of acts from attempted murder to child neglect to bankruptcy fraud," and that each of "many, many judicial officers" had reached the conclusion that appellant's suspicions of him were not supported by evidence and her anxiety was damaging to the child. Respondent believed the recent allegations were "so egregious and despicable" that they "constitute child abuse" and the child was no longer safe in appellant's care. He stated that Laird "made a point" of telling him that "it appeared" S.S. was "being coached" by appellant, that S.S. had told the interviewers respondent loved appellant but appellant hated respondent, and that he had learned from Detective Mather that appellant had asked the Sausalito police "to conduct a stakeout of my house, because she did not think I was using an appropriate

8

car seat for S.S. ." Respondent described S.S. 's behavior since the interviews as "very odd," "nervous and skittish, not at all herself." A declaration from Wick expressed concern about S.S. 's emotional well being and related incidents in which, following the false allegations, S.S. had made comments about her father going to jail. Respondent's former wife declared that she reluctantly agreed to permit the interviews of her children because she believed their responses would make it evident that the abuse allegations were not true, and that the baseless allegations were disruptive and detrimental to the family.

On August 14, 2012, the trial court (Judge Mahoney) issued an order to show cause setting a hearing for August 16 and giving respondent temporary sole legal and physical custody. The order directed the parties to address at the hearing the need for psychological evaluations of the parents by a court-appointed expert, custody and visitation pending preparation of the psychological reports, and the need for a hearing in September to consider the psychologist's findings and modification of the current physical custody plan.

On August 15, 2012, appellant filed a motion to continue the hearing, urging that she had insufficient time to prepare and her attorney had advised her he lacked the expertise necessary to represent her in a case involving child sexual abuse issues. Citing Family Code section 3027.5, subdivision (a), which prohibits restricting a parent's custody or visitation rights solely because the parent, based on reasonable belief, acted lawfully to determine whether the child was a victim of sexual abuse,[11] appellant urged that she never intentionally made false allegations but rather, based on S.S. 's statements,

---

[11] Family Code section 3027.5, subdivision (a) provides: "No parent shall be placed on supervised visitation, or be denied custody of or visitation with his or her child, and no custody or visitation rights shall be limited, solely because the parent (1) lawfully reported suspected sexual abuse of the child, (2) otherwise acted lawfully, based on a reasonable belief, to determine if his or her child was the victim of sexual abuse, or (3) sought treatment for the child from a licensed mental health professional for suspected sexual abuse."

reasonably believed respondent might have sexually abused the child and acted reasonably in contacting a therapist and cooperating in the ensuing investigation.

On August 16, 2012, Judge Mahoney denied the continuance, awarded temporary sole legal and physical custody to respondent, ordered a visitation plan for appellant, appointed Dr. Megan Lehmer to conduct a child custody evaluation including a psychological evaluation of both parents "as soon as possible consistent with best practices applicable to a custody evaluation" and ordered that S.S. not attend therapy pending Lehmer's recommendation. S.S. had seen a therapist twice since the conclusion of the CPS investigation and appellant wanted her to continue; respondent, arguing that appellant was acting "as if the trauma has already occurred" and was having S.S. see "a therapist for abusive behavior," wanted therapy to stop until the court evaluator made a recommendation." In denying the continuance, the court's order states, "the parties are advised that this hearing is not to address the merits of respondent's moving papers; rather it is to set up a visitation plan and a process to address the merits." Judge Mahoney made clear that he intended the custody evaluation to be completed expeditiously.

On September 28, 2012, appellant moved for modification of the temporary custody order, asking the court to return to the prior order and to allow therapy for S.S. She urged that S.S. 's behavior since the custody change demonstrated stress[12] and that the evaluation the court had contemplated being completed quickly was unlikely to be concluded before February or March 2013, with the possibility of a trial afterward.

---

[12] According to appellant, after hardly ever wetting the bed during the night since the spring of 2012, since the change in custody, S.S.was consistently waking up with a wet diaper; she was insisting on being carried, clinging to appellant and having "emotional melt-downs over the smallest things." It would take a long time for S.S.to warm up to appellant when returning to her care, and she told appellant that she wanted to spend more time with her but respondent "continuously tells her 'Mama doesn't love you, and you don't love mama.' " Two friends of appellants who had each been present during Skype conversations between appellant and S.S.while S.S.was with respondent observed that S.S.was not happy and appeared to be "a completely different girl" from what they knew her to be.

10

Appellant argued that it was unfair for her to have been given only one day to prepare for the hearing; the court's orders would have been different if it had considered the facts supporting her position; there was no evidence she intentionally made false statements as required for a change of custody under Family Code section 3027.5; and although CPS found the abuse allegations unfounded, S.S. 's statements "should have been investigated beyond two interviews." Appellant stated that S.S. continued to claim respondent was sexually abusing the children[13] and that "[i]f our daughter is indeed lying she is going to need professional help; and if she is not lying, she definitely needs help." Appellant's declaration additionally addressed a number of "inaccuracies, false statements, and apparent fabrications" in respondent's moving papers for the ex parte custody motion.[14]

Judge Mahoney denied appellant's motion on the basis that it was "premature and the issues raised are to be addressed in forthcoming custody evaluation." The court stated, "[appellant's] application reflects a significant effort on mother's part to overturn the court's August 16, 2012 Order. What is proffered is relevant to the fundamental issue

[13] Appellant related a number of statements by S.S. , including that respondent touched the children's "privates" again, that respondent "told everyone not to tell the truth, otherwise they will get a time-out," that respondent touches her "very gently," that respondent told her "[n]obody is going to listen to you" and Wick told her "[n]obody will believe you," that respondent "went inside of her privates with his index finger and it hurt a little bit," that she touched Gabriel's privates and Gabriel touched hers, and when he did he was "super-gentle." Appellant stated that when close to falling asleep, S.S. mumbled that respondent was being mean to Gabriel and hurt him, saying he "pushes/presses into him, into his 'pimpie' a whole lot" while making a fist with one hand and wrapping the other hand around it. Appellant said S.S. said respondent "hit her '[a] long time ago when I was at Juan. Remember, I did not want to tell something to Juan, and then I told something later, and papa hit my bottom." S.S. also said respondent slept naked next to her sometimes, did not touch her privates anymore but still touched the other children's, that she made him stop touching all of them, and that he hit them on their bottoms "often and very hard" "at bedtime."

[14] Appellant's declaration described various incidents to show that she had always encouraged a relationship between respondent and S.S. , and it was he who attempted to limit her contact with the child, and stated that respondent had violated court orders, including violating Judge Chaitin's order not to leave the child with anyone else by leaving her with Wick or a babysitter, had made "numerous" false statements to the court, and had misstated aspects of the facts and chronology of the CPS investigation.

11

before the court, a custody and visitation plan that is in the long term best interest of the child. At the same time, the court's Order of August 16, 2012 was issued based on an extremely serious set of facts reflected in reports of child protective workers and police officers."

Lehmer conducted the psychological evaluations called for in Judge Mahoney's August 16 order in September and October 2012. Lehmer found appellant "entirely cooperative with all aspects of the evaluation" but "quite anxious" and "eager to discuss her legal situation." Appellant's test results appeared to be "a good estimate" of her current level of functioning and suggested that she was "self-confident" and "capable," had "good interpersonal skills," was "well organized and likes to be in control," and had good problem solving skills but might "deal with uncertainty by over-intellectualizing." Her responses on the Child Sexual Behavior Inventory yielded a score four standard deviations above the norm, a finding that suggested S.S. had been sexually abused "but would need to be taken in context with other data before any definitive diagnosis could be reached."

Respondent was "generally cooperative" with his evaluation and his test results appeared to be a "fair to good" estimate of his current level of functioning. The testing indicated he might have "difficulty with interpersonal boundaries and a tendency to depersonalize others," "some difficulty thinking clearly," "problems trusting other people," and "a tendency to wall himself off in relationships," as well as that he might "be able to manage his anger up to a point but may have difficulties with temper control when provoked beyond that point." Scales developed to address parenting issues suggested respondent "may be responsible and self-controlled" and that he "represses and ignores problems, is unaware of the way in which he upsets others, and has a tendency to carry grudges." Respondent's Rorschach test did not offer enough data to adequately address impulse control because it "was extremely guarded" but suggested he had "some mild difficulty accurately interpreting his interactions with other people," and his "record" suggested he did not have adequate psychological resources to cope with stress, which "could make him vulnerable to problems with impulse control." The Rorschach

test suggested he had trouble dealing with ambiguity, might have concerns about his self-worth and attempt to deal with this by "distorting the way in which he sees himself"; the nature of his interpersonal relationships "appears to be somewhat superficial" and he "may be inclined to misinterpret the intentions of others in a manner that could lead to faulty judgment." Respondent did not endorse any of the behaviors on the Child Sexual Behavior Inventory, which was "fairly unusual" and indicated that he was either "in denial about even relatively normal range behaviors such as 'touches private parts when at home less than once a month' or has too recently become the primary custodian for his daughter to be fully familiar with her behavior."

Lehmer was not available to conduct the custody evaluation Judge Mahoney ordered, and the parties stipulated to the appointment of Licensed Clinical Social Worker Rhonda Barovsky for this purpose. The custody evaluation was conducted in November and December 2012.[15]

While the evaluation was ongoing, on November 7, according to appellant, S.S. uncharacteristically bit another child. On the evening of November 10, appellant took S.S. to the emergency room at San Francisco General Hospital with a complaint of vaginal pain. Respondent had emailed appellant that afternoon saying S.S. had complained about "irritation in her privates" and Wick had applied Desitin. When S.S. arrived at 6:00 p.m., appellant gave her a bath and "applied Desitin, upon which she screamed in pain." S.S. said respondent had "touched and pinched her privates" that morning. Appellant talked with an advice nurse at UCSF and then took S.S. to the emergency room.

The emergency room report indicates that S.S. was examined by a physician; a Child and Adolescent Support Advocacy and Resource Center (CASARC) nurse

---

[15] Barovsky first met with the parties on November 1, then met with each of the parties separately on several occasions, with S.S. for four sessions, with S.S. and appellant together, with S.S. , respondent, Wick, Emelia, and Gabriel together, with Wick alone, and with respondent's ex-wife alone. Barovsky also spoke by telephone with various contacts including Dr. Lehmer, S.S. 's pediatricians and preschool teachers, and Detective Mather, PSW Laird and PSW Hartshorn.

practitioner was present but no forensic examination was performed because it was determined that the case had to be referred to Marin County. The report states that appellant was concerned about possible sexual abuse, saying S.S. had said respondent pinched her. On direct questioning, S.S. reported that her father "hurt her 'bixie' (pointing at vagina) by touch early this morning" and applied cream to help with pain. S.S. had no pain on examination; there was "mild erythema" (redness) on her external genitalia, with no trauma or laceration, and her condition was assessed as "mild vaginitis no obvious trauma on exam." S.S. was described as "active and playful, pleasant." The police and CPS were notified. Appellant later testified at trial that a forensic examination was begun and then suspended when it was determined that the case belonged in Marin, but that the examiner told her there did not appear to be any trauma.

Detective Mather arrived at the hospital about 1:00 a.m. According to appellant, he offered to photograph any bruising or other trauma S.S. had sustained, which she declined because she had already been told there was no evidence of trauma and therefore did not want to put S.S. through another examination. Appellant also said that Mather offered another interview and, while not opposed, she suggested that it might be better to see what information the custody evaluator got from S.S. , as well as that any interview would have to be with a female interviewer. The next morning, CPS told her to bring S.S.to Marin for another interview before returning her to respondent, but when they arrived she was told there was not going to be another investigation. Barovsky reported that Mather told her he had no intention of having S.S.re-interviewed; he wanted S.S.to be examined at the hospital and appellant refused, saying she did not think anything would be revealed because she did not think respondent "enters S.S. 's vagina when he molests her."

On November 13, respondent and Wick took S.S.to see Pediatrician Otto von Franque at Kaiser. According to the report of this visit, respondent said S.S. had complained of her privates hurting after lunch on November 10, pointing to her vaginal area. Respondent was not aware of any trauma but said the child was "very competitive and bikes vigorously" and he "figured perhaps she had irritated groin by biking." Wick

applied Desitin and when asked 10 minutes later, S.S. said she was fine. The physical exam was normal and Dr. von Franque did not suspect abuse. On November 14, in an email responding to respondent having sent her von Franque's report, appellant told respondent that she had taken S.S.to "the doctor" the preceding Saturday evening.[16]

On December 23, appellant took S.S.to an urgent care clinic because she arrived from respondent's home with a "major rash on her privates, particularly around her anus," as she had the prior weekend as well. S.S. was diagnosed with candidal vulvovaginitis. At trial, Judge Tang described photographs appellant provided as showing "very serious rashes" around "the private parts, both the front and the back."

For the custody evaluation, Barovsky met with S.S. and family members, observed recordings of the forensic interviews and collected information from various individuals. Marin PSW Hartshorn told Barovsky he believed S.S. had been coached to make allegations against respondent, as she "made no clear disclosures that make sense as a victim" and had not displayed behavioral symptoms such as sexually acting out at school or shown regression in development. Hartshorn "raised the issue of considering mother's behavior as being emotionally abusive toward S.S. " Relating Hartshorn's comments, Barovsky's report states, "Based on her comments, and the writings in her journal, it appears that mother has been trying to generate an abuse narrative against father almost since S.S. was born. Mother appears obsessed about developing an abuse narrative and getting S.S.to disclose abuse. It appears that she repeatedly misconstrues events and then reconfigures them to fit her abuse narrative focusing on implicating father in all kinds of things." Hartshorn said he heard appellant tell Mather that she wanted to move to Austria; Mather, however, stated that appellant never told him this. Hartshorn felt respondent did not have problems with "power and control" and it was "almost impossible to believe an adult would violate a child without that element."

---

[16] Respondent maintained he did not learn of the emergency room visit until a month after the fact, when he read about it in Barovsky's report. Von Franque's report relates that respondent said that when he told S.S.he was taking her to a doctor because of her discomfort a few days before, she said she had already been to a doctor.

San Francisco PSW Laird told Barovsky that appellant honestly believed S.S. had been sexually molested and therefore was "hypervigilant and overly anxious." He said that respondent was very angry with him when they met and that while the anger was understandable, respondent should have been "better at moderating it."

Detective Mather related that appellant had sent him a copy of her "42 page journal" of statements S.S. made, dating to May 2010, from which it appeared that appellant interrogated the child when she returned from being with respondent. Most of the entries concerned S.S. being spanked and respondent giving her junk food. When Mather told appellant nothing was disclosed in the three children's interviews to substantiate the abuse allegations, she "acted confused" and wanted to know what to do because she did not know if the things S.S. reported were made up or really happened. When told about the allegations, respondent seemed most concerned about the children, whereas in Mather's conversations with appellant, she displayed no concern or emotion for S.S. and gave the impression she was "selling a story." After the interviews, appellant told Mather she had a recording of "everything S.S. ever told her" but she did not follow through on giving them to him. Regarding the November emergency room visit, Mather said the doctors told him vaginitis can be caused by bike riding and is common in active children.

S.S. 's pediatrician, Dr. Becker, told Barovsky that in late July 2012, appellant asked him to examine S.S.to see if she had been sexually molested. He said a physical exam would not be helpful and recommended appellant inform CPS and take S.S. for play therapy. A week later appellant brought S.S. for a routine visit and raised the issue again; Becker made the same recommendations and advised appellant not to ask S.S. any leading questions.

S.S. 's preschool teacher related that she had not noticed any changes in S.S. 's personality and that S.S. was "more social than before" and played more with her friends.

Reporting on her sessions with S.S. , Barovsky stated that S.S. was able to identify truth from fiction and promised to tell the truth. S.S. said she had not seen either of her parents naked except in the bathtub. During the second of her six sessions, she said her

16

father touched her "privates" while she was in her room wearing no clothes, but did not say more about it. At the next, asked if her father pinching her was real or fake, she said it was real and he pinched her "privates." Later in the session, when Barovsky asked her to tell what happened, S.S. said she did not remember. At another session, asked if someone had done something to her body that she did not like, S.S. said she did not know; asked if someone had asked her to do something to their body that she did not like, she said "no."

Barovsky concluded, consistent with the results of the CPS investigation, that S.S. had not been molested or mistreated by respondent, although she qualified this conclusion at trial by saying she had concluded "it was most likely that [respondent] didn't molest [his] daughter." Barovsky found "no data" to indicate S.S. or respondent's other children had been molested by him or anyone else, and stated that if any molestation had been occurring in the household, it would have been reflected in the older children's interviews. Barovsky opined that it was "very wrong to include Gabriel and Emelia in mother's almost delusional belief about father," to subject them to "forensic interviews to satisfy mother's fears and concerns." Barovsky explained that the behavioral symptoms "usually" shown by children who have been molested, especially over a long period of time, were "glaringly absent with S.S."

Barovsky stated that appellant's journal documented her "questioning almost to the point of interrogating S.S. when she returns from time spent with father since she was two years old." Appellant's "ongoing questioning of S.S. has an element of emotional abuse" and "[i]t is almost as if mother cannot stop herself from questioning S.S.," even after specifically being told not to do so after S.S.'s first forensic interview. Barovsky discussed research showing that children who have been questioned repeatedly incorporate false memories into their beliefs and "often present as identical to children who have been molested," in particular an experiment with preschool children that showed 80 percent remembered fictitious events as if they had actually happened. Barovsky believed it was most likely that appellant had "unconsciously and unwittingly encouraged S.S.to believe that her father has harmed her by her constant questioning S.S.

17

about her father." She discussed appellant's acceptance of, and acting upon, everything S.S. reported about respondent as a failure to exercise adult judgment; found the late-night emergency room trip an inappropriate reaction to S.S. 's symptoms; and found appellant's failure to tell respondent about that trip—even in the midst of a custody evaluation and with respondent having sole legal custody—indicative of appellant's unwillingness to communicate with respondent. Barovsky was concerned about enmeshment and the need for S.S.to psychologically differentiate from appellant, and found respondent set appropriate limits for the child while appellant did not. She found appellant unable to "let things go" and described some of appellant's accusations as "border[ing] on the ridiculous."[17] In interacting with respondent, Barovsky saw the behavior appellant described when she said respondent responded to her with "sarcasm, put-downs, and anger," but Barovsky viewed his "defensiveness" as "understandable" given the history of allegations against him.

Barovsky recommended individual therapy for appellant, to help her understand the consequences of her constant questioning of S.S. and guide her toward healthier parenting practices, as well as individual play therapy for S.S.to help her "learn to let go of her fictitious beliefs about father's behavior toward her," "learn to distinguish reality from fiction," and help her "cope with the years of conflict between her parents, and the years of frequent leading questions by mother." Barovsky also recommended that the parents attend co-parenting therapy together to learn how to "parallel parent" or at least set up a system for communication and to facilitate building trust. She recommended that S.S. live primarily with respondent and that appellant initially have supervised visitation

---

[17] The example Barovsky gave was that when S.S.was two years old, appellant subpoenaed respondent's Safeway records, learned he bought Gerber 3 baby food (made for three year olds) and concluded, without checking with respondent, that he was feeding S.S.age-inappropriate food; in fact, the food was for respondent's older children, who have a medical condition for which this food was dietary supplement. Appellant maintained that Barovsky misunderstood: Although she obtained the Safeway records when S.S.was two years old, in connection with the 2010 custody litigation, the incident she was concerned about occurred in 2008, when S.S.was six days old, and respondent gave her solid food that caused her to vomit for days.

18

while in therapy, then after six to 12 months move toward the parties having "a more equitable time-share plan." Since appellant had been S.S. 's primary parent until August 2012, Barovsky believed "any further reduction in time between mother and S.S. may have a negative impact on S.S. ," potentially causing her to feel "emotionally abandoned by mother" and "confused and angry with father," as well as causing appellant to feel "victimized by the court system," which would "not help her gain the insight into her actions needed to improve her parenting choices."

Regarding the time period between completion of the custody evaluation at the end of December 2012 and the trial before Judge Tang in July 2013, appellant testified at trial that in January 2013, S.S. told another child, "I'm going to kill you," and "said to her own cough, 'go shoot yourself and die.' " Appellant testified, and provided photographs to document, that over the next months S.S. began injuring herself by scratching and pinching her nose and hand until they bled, and began biting her nails.

In July, after two and a half days of trial, Judge Tang issued a permanent order giving respondent sole legal and physical custody, with visitation for appellant every other weekend from Friday afternoon until Monday morning and every Wednesday evening. The court ordered one year of individual therapy for appellant, one year of individual play therapy for S.S. , and one year of coparenting therapy for appellant and respondent.

Appellant filed her notice of appeal on October 30, 2013.

On October 15, respondent filed a motion for attorney fees and costs in the amount of $27,237. The court granted the motion in part, ordering appellant to pay $2,429 in attorney fees.

## DISCUSSION

### I.

19

Appellant contends she was denied a fair trial in that she was prevented from attempting to prove that respondent had been sexually abusing S.S. or at least neglecting to properly care for her. Appellant argues that Judge Tang erroneously concluded Judge Mahoney had previously determined no molestation had occurred. Due to this conclusion, appellant urges, Judge Tang prevented her from challenging the FCS report that found no abuse or rebutting Barovsky's "biased and error-filled report" through cross examination and expert testimony.[18]

" 'The term "due process of law" asserts a fundamental principle of justice which is not subject to any precise definition but deals essentially with the denial of fundamental fairness, shocking to the universal sense of justice.' (*Gray v. Whitmore* (1971) 17 Cal.App.3d 1, 20.) ' "The trial of a case should not only be fair in fact, but it should also appear to be fair." [Citations.] A prime corollary of the foregoing rule is that "A trial judge should not prejudge the issues but should keep an open mind until all the evidence is presented to him." ' (*Hansen v. Hansen* (1965) 233 Cal.App.2d 575, 584.)" (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 290-291.) " 'Denying a party the right to testify or to offer evidence is reversible per se.' " (*Id.* at p. 291, quoting *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677.)

Judge Tang ruled that no evidence would be permitted on the question whether respondent in fact abused S.S. prior to Judge Mahoney's August 2012 temporary custody order. Accordingly, appellant was not permitted to challenge the credentials of the individuals who investigated the sexual abuse allegations in the summer of 2012, the methods used in the investigation or the conclusions reached.

The reason for Judge Tang's ruling was that she believed Judge Mahoney had already adjudicated the merits of the molestation allegations. Prior to trial, in ruling on

---

[18] "No respondent's brief was filed. The rule we follow in such circumstances 'is to examine the record on the basis of appellant's brief and to reverse only if prejudicial error is found. [Citations.]' (*Votaw Precision Tool Co. v. Air Canada* (1976) 60 Cal.App.3d 52, 55; accord, *Carboni v. Arrospide* (1991) 2 Cal.App.4th 76, 80, fn. 2; see also *In re Bryce C.* (1995) 12 Cal.4th 226, 232-233.)" (*Lee v. Wells Fargo Bank* (2001) 88 Cal.App.4th 1187, 1192, fn. 7.)

respondent's ex parte motion to prohibit his deposition,[19] Judge Tang ordered, "Petitioner not to probe any further into the allegations of sexual molestation by the respondent because this issue *has already been adjudicated* by Judge Mahoney." (Italics added.) On the first day of trial, responding to appellant's opening statement, the judge stated, "Judge Mahoney, in his prior decision, *carefully and cautiously evaluated the evidence* and, with the best interest of the child in mind, awarded sole legal and physical custody to the father. And in so doing, he basically found that the sexual molestation allegations were unfounded." (Italics added.) Judge Tang stated that Judge Mahoney's decision was supported by the opinions of Laird, Mather, Hartshorn, and Funes, "each an expert in the evaluation of child sexual molestation," and there was no further basis to litigate the issue of sexual molestation unless there was "new and fresh evidence that was not known or could not have been known to Judge Mahoney that are so contrary to the decision that Judge Mahoney made that that renders his temporary custody decision unsupportable." The judge therefore excluded "any allegations or the attempt to try the sexual molestation of the father because *those are subjects and issues that Judge Mahoney has tried, and they are decided under his August decision*." (Italics added.)

Judge Tang's view of Judge Mahoney's prior order was plainly incorrect: Judge Mahoney did *not* adjudicate the issue of whether respondent in fact molested S.S. After the August 14 ex parte hearing on respondent's motion to change custody, Judge Mahoney set a hearing for August 16 in order to allow appellant to "at least present her position." Judge Mahoney then denied appellant's request for a continuance of this hearing, advising the parties "that this hearing is *not to address the merits* of respondent's moving papers; rather, it is to set up a visitation plan and a process to address the merits." Judge Mahoney gave respondent temporary sole legal and physical custody on the basis

---

[19] After appellant noticed respondent's deposition for up to seven hours (the time limit imposed by Code Civ. Proc. § 2025.290, subd. (a)), respondent asked the court to prohibit appellant from deposing him or at least limit the deposition to one hour, arguing that a deposition would serve no constructive purpose and would harm S.S.by increasing the hostility between her parents. Judge Tang denied the motion but limited the length of the deposition to three hours.

21

of respondent's moving papers, which included the CPS report finding the sexual abuse allegations unfounded; no testimony was taken and appellant had no opportunity to cross-examine the author of the report or any other witness.

The issue directly presented by respondent's ex parte motion was not whether S.S. in fact had been molested but rather, *assuming on the basis of the CPS report* that she had not been molested, whether appellant was causing S.S. harm by falsely accusing respondent of sexual abuse and "trying to brainwash" the child into believing respondent was molesting her. Judge Tang—very reasonably—assumed that Judge Mahoney could not have given respondent sole custody unless the judge believed respondent was not abusing the child. And such belief on Judge Mahoney's part was reasonable in light of the CPS report finding there had been no abuse. At that point, no one was challenging the CPS conclusion; appellant's argument was simply that it was reasonable for her to take the actions she did when S.S. described having been sexually molested.[20] Judge Mahoney's August 16 order, and the transcripts of the August 14 and 16 hearings, make clear that there was no *adjudication* of the sexual abuse allegations. There was the CPS report, which served as *evidence* respondent had not abused S.S. , but there was no adjudication and certainly no basis for Judge Tang's conclusion that Judge Mahoney "*carefully and cautiously evaluated the evidence*" on this issue.

In August 2012, respondent presented Judge Mahoney with what the judge described as an "unusual" request for a "drastic" change in S.S. 's custody arrangement, and the judge made clear his discomfort in acting on an ex parte basis. Judge Mahoney wanted psychological evaluations of the parents and a custody evaluation to inform the ultimate decision on custody and visitation, and emphasized that these needed to be completed quickly. It is apparent that Judge Mahoney did not view the August 16 order as resolving the *merits* of any issue in the case.

---

[20] Appellant began to raise questions about the conclusion of the CPS investigation in her September 2012 motion to modify the temporary custody order.

22

At the trial before Judge Tang, appellant sought to question the CPS report's conclusion that the abuse allegations were unfounded and to challenge Barovsky's report and recommendations. In a motion in limine, appellant requested an order allowing the parties to address allegations of sexual abuse at trial. Appellant stated: "Whether sexual abuse occurred has never been adjudicated, and the best interests of the child in this case, [S.S. ], can only be served by frank discussion and analysis at trial of the facts that have been developed. Moreover, the risk of ongoing or future abuse is a factor that the court must consider in analyzing the best interests of the child in the custody context." Appellant pointed out that she raised the issue of whether respondent had sexually abused S.S. when she moved to modify Judge Mahoney's temporary custody order, and Judge Mahoney ruled the motion was " 'premature and the issues raised are to be addressed in forthcoming custody evaluation . . . . What is proffered is relevant to the fundamental issue before the court, a custody and visitation plan that is in the long term best interest of the child. . . ." She also noted that Judge Tang, in her pretrial scheduling order, "authorized testimony by Mona El-Halawani, Charleen Casey-Lerma, and Brian Mather, who are witnesses to nothing but S.S. 's disclosures and the statements and conduct of the parties in connection therewith."

Appellant sought to present expert testimony that the method used in the CPS investigation—forensic interviews—"rarely uncovers abuse, because children are unlikely to disclose abuse in a forensic setting." Appellant proposed to have Dr. Hala Saleem, a licensed adult, adolescent and child psychiatrist, critique "Ms. Barovsky's custody evaluation, Dr. Lehmer's psychological testing, and the integration of these test results in Ms. Barovsky's report" and testify about "normal child behavior; suggestibility; development; physical, mental, and sexual abuse including, but not limited to signs of mental, physical and sexual abuse; forensic and clinical interviews; [CPS] procedure; medical care; mental disorders; domestic violence; substance abuse; and prescription drugs including psychotropic drugs." Appellant proposed to have Lehmer testify about "discrepancies" between her report and Barovsky's, her conversation with Barovsky, and possibly "child behavior; suggestibility; development; physical, mental, and sexual

23

abuse; forensic and clinical interviews; [CPS] procedure; medical care; mental disorders; domestic violence; substance abuse; and the effects of psychoactive prescription drugs."

Respondent objected to the motion concerning sexual abuse allegations, arguing that "[t]he fact that the petitioner after a year of overwhelming evidence to the contrary from doctors, mediators, [CPS], police and the Prandi Institute still believes child S.S. is the victim of sexual abuse and molestation, represents the strongest argument to date for the court to consider making the recommendations of the court-appointed evaluator into permanent orders." Noting Judge Tang's May 28, 2013, ruling precluding further discussion of the sexual abuse allegations at the parties' depositions, respondent urged that "[t]his trial is also not about creating the grounds for a re-investigation. This trial is about a court which rightly decided to initiate a Child Custody Evaluation Report and its findings and recommendations presented to the court on December 26, 2012. Clearly, sexual abuse and child molestation allegations should not be open for review as issues at trial."

Respondent also moved in limine to dismiss Dr. Saleem as a witness, arguing that her credentials to act as an expert were lacking and that the issues of substance abuse, child abuse and sexual molestation were not before the court. He asked the court to restrict Lehmer's testimony to preclude reference to certain of the matters appellant had identified—"child behavior, suggestibility, development, physical, mental, and sexual abuse, forensic and clinical interviews, CPS procedure, medical care, mental disorders, domestic violence, substance abuse, and the effects of psychoactive prescription drugs"— on the grounds that "they are more speculative in nature, and are not part of the services requested by the court, and are also not current issues before the court."

The court's specific rulings on the motions in limine, and any explanation thereof, do not appear in the record before us. In her opening statement, however, appellant objected to Judge Tang having ruled that issues of sexual abuse would be limited to events *after* August 2012, to respondent's motions regarding her proposed expert witnesses, and to Judge Tang having changed a previous order allowing Mona El-Halawani's testimony to now preclude it.

24

In addition, in her opening statement, appellant maintained that none of the CPS investigators had significant experience or credentials in the area of investigating child sexual abuse: According to appellant, Laird was unlicensed; Hartshorn was unlicensed, had "at best just over a year of experience" and described himself as starting his MSW studies that summer; Detective Mather, as indicated on the police department's website, had never been involved in a child sexual abuse case and specialized in property crimes, drug busts, patrol boat operations and instituting new procedures for storing property and evidence; and Funes (the interviewer) was a former Marriage and Family Therapist Intern whose Board of Behavioral Sciences registration was canceled on February 28, 2006. When appellant later attempted to introduce evidence to support these points, Judge Tang ruled it inadmissible as hearsay and not relevant "given my ruling that Judge Mahoney's decision would preclude any further litigation of whether Dad had actually molested the daughter. [¶] If that goes to, you know, the credibility of Mr. Funes and his investigation, I think that's already, you know, determined by Judge Mahoney's temporary order."

The validity of the CPS determination was obviously relevant to the proper determination of the issues before the court. Respondent's motion to change custody was premised on the absence of actual abuse and alleged harm in appellant falsely causing S.S.to believe abuse was occurring. If the CPS conclusion was not correct, the entire context in which appellant's conduct had to be evaluated, and S.S. 's best interests determined, would be different. Potential challenges to the basis for Barovsky's conclusion "confirming" the CPS determination of no abuse, which appellant sought to present through her expert witnesses, were relevant for the same reason. Judge Tang excluded evidence bearing on the question of abuse before August 2012 *solely* because she believed the issue had already been adjudicated by Judge Mahoney. Due to this erroneous belief, appellant was denied any opportunity to challenge the conclusion that

respondent had not abused S.S. and to obtain the judicial determination that Judge Tang erroneously believed had already been made.

We recognize that Judge Tang did receive evidence on the question whether respondent abused S.S. *after* August 2012 and decided he did not. It is impossible to assess whether, or to what extent, this decision was influenced by the erroneous belief that previous abuse allegations had been *judicially* determined unfounded. But the decision was necessarily reached with the knowledge that CPS had concluded the previous allegations were unfounded—and appellant was never permitted the opportunity to challenge the validity of that conclusion.

Appellant characterizes the present case as, like *Carlsson, supra,* 163 Cal.App.4th 281, involving a judge who prejudged critical facts and "bent" the trial to justify the decision she had already reached. *Carlsson* was an extreme case: From the beginning of trial, the judge made clear his impatience with the defendant's attorney and the pace of trial, repeatedly threatening to declare a mistrial if the matter was not completed within a specified time frame, then abruptly leaving the bench and ending the trial in the midst of a witness's testimony. (*Id.* at pp. 286-289.) The present case is of a different nature: Judge Tang did not "prejudge" the sexual abuse issue but rather acted on the mistaken view that the issue was not open to question because it had already been determined by a different judge. What occurred appears to have been a consequence of misunderstanding rather than bias. But we cannot ignore the fact that this trial was conducted on a false premise that denied appellant her day in court.

This is not to suggest any view on the likelihood of appellant prevailing in her attempt to discredit the CPS report or that of the court-appointed evaluator. We reverse with the utmost reluctance, as the prospect of further judicial proceedings for these parties, who have been embroiled in litigation for the entire life of their daughter, is deeply concerning. We reverse because the violation of appellant's due process rights leaves us no alternative.[21]

---

[21] Appellant's argument that Judge Mahoney's August 2012 order denied her due process is not properly before us. Although temporary custody orders are not appealable, they are reviewable by writ petition. (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 565.) Appellant did not seek review of Judge Mahoney's order. Further, challenges to

## II.

Appellant additionally argues that the change of custody was legally improper because there were no changed circumstances and there was no legal basis for the change of custody because there was no change of circumstances and the change violated Family Code section 3027.5, subdivision (a).

"Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child. The court and the family have 'the widest discretion to choose a parenting plan that is in the best interest of the child.' (Fam. Code, § 3040, subd. [(c)].) When determining the best interest of the child, relevant factors include the health, safety and welfare of the child, any history of abuse by one parent against the child or the other parent, and the nature and amount of contact with the parents. ([Fam. Code,] § 3011.)" (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255, fn. omitted (*Montenegro*).)

Once a final judicial custody order is in place, however, it can be changed only if the party seeking modification demonstrates "a significant change of circumstances justifying a modification." (*Montenegro, supra*, 26 Cal.4th at p. 256; *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 40 (*Burgess*).) " '[T]he changed-circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test. It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements.' " (*Montenegro*, at p. 256, quoting *Burchard v.*

---

temporary custody orders are generally moot by the time those orders have been superseded by a permanent custody order. (*Id.* at p. 566.) That is certainly the case here. Since "we cannot turn back the clock and restore the custody situation that existed before the orders were made[,]" there is no effective relief we could order at this time even if there were merit to the challenge to the temporary custody order. (*Ibid.*)

*Garay* (1986) 42 Cal.3d 531, 535.) "[T]he burden of showing a sufficient change in circumstances is on the party seeking the change of custody." (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 731 (*Carney*).) "The showing required is substantial. We have previously held that a child should not be removed from prior custody of one parent and given to the other ' "unless the material facts and circumstances occurring subsequently are of a kind to render it essential or expedient for the welfare of the child that there be a change." ' (*Carney*, . . . at p. 730.)" (*Burgess*, at p. 38.)

Judge Tang did not make a finding of changed circumstances. According to the Statement of Decision, "[respondent] was awarded temporary sole legal and sole physical custody of S.S. Temporary custody orders are subject to modification without demonstrating a change of circumstances. This court conducts a *de novo* review and applies the best interest of the child standard in making its decision (*Montenegro*[, *supra*,] 26 Cal.4th 249, [Fam. Code, §] 3011.)"

Appellant is correct that the trial court erred. Judge Mahoney's temporary custody order altered a preexisting *permanent* custody order. The temporary order made no finding of changed circumstances. Judge Tang could not order a change of custody without the required determination that sufficiently substantial changed circumstances existed. Because we are reversing the order for the reasons discussed above, this issue can be addressed on remand.

Appellant's argument that the change of custody violated Family Code section 3027.5, subdivision (a), however, has no merit. Appellant characterizes the statute as providing that allegations of child sexual abuse which are unfounded or unsubstantiated but not fraudulent do not justify a change of custody. As indicated above, the statute provides that no parent "shall be placed on supervised visitation, or be denied custody of or visitation with his or her child, and no custody or visitation rights shall be limited, *solely* because the parent (1) lawfully reported suspected sexual abuse of the child, (2) otherwise acted lawfully, based on a reasonable belief, to determine if his or her child was the victim of sexual abuse, or (3) sought treatment for the child from a licensed mental health professional for suspected sexual abuse." (Fam. Code, § 3027.5, subd. (a),

28

italics added.) Noting Barovsky's testimony that appellant reasonably believed respondent might have engaged in sexual abuse and reasonably researched therapists to discuss this possibility and the likelihood of S.S. 's statements being accurate, appellant argues that the statute precludes the change of custody ordered here because there was no evidence the allegations were fraudulent.

This argument misunderstands the basis of the custody order. Respondent was not given custody of S.S. simply because appellant alleged possible sexual abuse. The custody order was based on the trial court's conclusion that S.S. suffered emotional harm from appellant's questioning of her and refusal to accept the CPS conclusion that respondent was not abusing her. As the court explained, even before the sexual abuse allegations were raised, Judge Sing had expressed concern about the effect appellant's unfounded suspicions of respondent were having on S.S. , and two years later S.S. was exhibiting stress "in more open ways." It was not the fact that appellant made allegations of sexual abuse that were deemed unfounded but the manner in which she allowed her suspicions to affect S.S. that formed the basis of the court's order.

### III.

Appellant offers myriad examples of what she views as the trial court's biased or otherwise erroneous evidentiary rulings. To the extent these rulings were based on Judge Tang's preclusion of issues related to alleged abuse occurring before August 2012, including the credibility and of the CPS report, they will necessarily be resolved differently on retrial. We address appellant's specific complaints only to the extent they raise issues requiring further guidance for the trial court.

Appellant argues the court should have excluded Barovsky's "biased" report and testimony, raising issues ranging from deficient methodology to factual inaccuracies and alleged lies in the report.[22] There is no question some errors and inconsistencies exist.

---

[22] Shortly before oral argument, appellant filed a motion seeking permission to send this court an additional exhibit pursuant to rule 8.224(c) of the California Rules of Court. The document in question is a November 3, 2014 letter from the California Board of Behavioral Sciences (BBS) responding to a complaint appellant filed against Barovsky

29

For example, Barovsky stated that Lehmer administered "blind psychological testing" on the parents. Lehmer testified that this was incorrect: "[B]lind testing" is when a psychologist interprets test results without having met the subject, whereas she met the parties and administered a full battery of psychological testing. While Barovsky testified that her practice when she interviews professionals is to type up her notes and email them to the interviewee to check for accuracy, Lehmer testified that Barovsky did not give her an opportunity to review the description of their conversation that Barovsky put in the report. The report stated that Lehmer told Barovsky she felt appellant presented as arrogant, and that respondent's resistance to testing was understandable since he had been accused of so much and rendered the validity of his test results questionable; Lehmer testified that she had not made these statements, she did not find appellant arrogant and she believed the test results were valid. Barovsky testified that she interviewed appellant's friend Jin Park but did not include the interview in her report, but Park testified that Barovsky never contacted her.[23] With regard to her not having interviewed El-Halawani and Casey-Lerma, the therapists who saw S.S.in July 2012, Barovsky testified that she asked appellant for El-Halawani's contact information and appellant did not provide it, while in her report she stated that she left several voice mail messages for El-Halawani and Casey-Lerma that were not returned.

Some of the errors to which appellant refers appear insignificant when considered

in August 2014 informing appellant that the BBS can act on an allegation of unprofessional conduct by a custody evaluator only after the court has made a finding of unprofessional conduct. Rule 8.224 addresses the transmittal to the reviewing court of exhibits that were "admitted in evidence, refused, or lodged" in the trial court but not included in the record on appeal. (Rule 8.224(a).) Rule 8.224(c) provides that after expiration of the initial time periods specified in rule 8.224(a), a party may apply to the reviewing court for permission to send an exhibit.

This rule has no application to documents that were never introduced in the trial court and thus provides no support for appellant's motion, which we hereby deny.

[23] Barovsky testified that she spoke with Park on the phone and Park told her she and appellant did things together, their children were close, and she thought appellant was a good parent.

in context. For instance, with respect to the November 10 incident, Barovsky stated that S.S. screamed in pain while appellant was bathing her and that appellant should have applied more cream and waited until morning to see if S.S. needed medical attention, when appellant's description of the episode actually was that S.S. screamed in pain *after* the bath, *when appellant applied the cream.* This factual error does not undermine Barovsky's point—that the situation did not have the urgency appellant ascribed to it. Similarly, appellant finds bias in Barovsky's stated view that appellant's taking S.S.to the emergency room on November 10, when the child "screamed in pain," was "off base" but respondent's taking her to the doctor several days later, when she was no longer in pain, was "a very wise decision." Again, Barovsky's point was simply that the situation on November 10 did not present urgency sufficient to justify taking a four-year-old to the emergency room late on a Saturday night.

Indeed, some of appellant's complaints border on disingenuous. She claims Barovsky had no basis for saying respondent did not learn of the emergency room visit until he read Barovsky's report in December because appellant copied Barovsky on the November 14 email she sent respondent about this visit. The email, however, only said appellant took S.S. "to the doctor on Saturday evening"; it gave no indication an emergency room visit lasting until early morning hours was involved. Barovsky's comment was in reference to the fact of the *emergency room* visit. Similarly, appellant argues Barovsky's trial testimony that she did not know either parent had a psychiatrist was contradicted by appellant having provided her with the name of respondent's psychiatrist in the parent questionnaire she filled out for the evaluation.[24] Barovsky

testified that she did not consider this questionnaire in her report because appellant gave it to her late, after the report had already been written.

In any event, these sorts of errors, inconsistencies and contradictions went to

---

[24] The information appellant provided was the name of the psychiatrist who prescribed diazepam for respondent in 2008.

Barovsky's credibility; they were raised in the trial court and their significance was for the trial court to determine. Barovsky's testimony was properly received.

Appellant complains that she was precluded from having her expert witnesses critique Barovsky's report. Dr. Saleem did testify about two issues central to Barovsky's report, enmeshment and fabricated memories, offering opinions that differed from Barovsky's. Saleem did not believe enmeshment was an issue in this case because S.S. 's school report indicated she was doing well socially and academically, and not exhibiting any problems separating from her parent. Contrary to Barovsky, she did not believe sleeping in the same bed as a parent (as S.S. had been doing in appellant's studio apartment) was pivotal in enmeshment. Saleem also testified that in the research study Barovsky presented as showing 80 percent of the subjects were misled to believe fictitious events had really happened, in fact it was only 40 percent.

Aside from the issues concerning sexual abuse, appellant's main concern with Barovsky's report appears to be that Barovsky did not sufficiently consider respondent's alleged history of substance abuse and violence toward women. As to the former, appellant contends Barovsky was not qualified to perform the substance abuse assessment she purported to conduct. Appellant did elicit Lehmer's testimony that when she conducted custody evaluations, she generally had an expert conduct a drug and alcohol assessment if she had concerns in this area, as well as that respondent's apparent rigidity concerning alcohol—stating that he never had more than two glasses of wine with dinner—raised a "red flag" for her. Barovsky herself testified that she would have preferred to refer the substance abuse assessment to an expert but did not because the parties could not afford this, and her testimony and report reflected that her assessment did not consist of anything more than asking respondent, Wick and Lamb about his use of alcohol and medication. Appellant's concerns are based on respondent's use of anxiety and sleeping medication in 2008 and earlier and were addressed in the 2010 custody litigation. Barovsky testified that her evaluation was limited to current issues and

appellant suggested no evidence of current substance abuse.[25]

With respect to domestic violence, appellant again refers to issues that were raised in the 2010 trial, at the end of which the court concluded there was "no evidence" respondent "presently had violent tendencies or had committed acts of domestic violence." One of the incidents at issue occurred in the midst of respondent's divorce, when Lamb called the police because respondent was "overly aggressive" in attempting to take from her house a computer she had agreed to give him. Barovsky discussed this incident with Lamb at length and explained at trial her reasons for concluding it did not indicate a pervasive pattern or the type of abuse that would be suggestive of "an opportunistic or regressed sex offender." The court in 2010 had noted that the "excessive anger" respondent demonstrated in the incident was "short-lived." When appellant began to ask Barovsky about other incidents, the court ascertained from Barovsky that she was aware of the incidents and they did not alter her opinion.[26] Because the additional incidents had also been before the court in 2010, Judge Tang excluded further discussion of them under Evidence Code section 352, finding they were too remote to be helpful and their probative value was outweighed by undue consumption of time and prejudice. Appellant now asserts that Dr. Saleem would have testified that respondent's "history of abusing women was unlikely to change without therapy," but she did not make this offer

---

[25] Appellant asserts that Barovsky learned nothing from her assessment, as indicated by her testimony, "whether [respondent] met the diagnosis for substance abuse, I don't know. I don't believe so." Barovsky had been asked whether respondent had "a substance abuse history at any given time in the past." Her response concerned past history, not whether respondent had a current problem with substance abuse.

[26] Another of the examples to which appellant refers was the assertion of one of respondent's ex-girlfriends (in a 2009 email to appellant and in a 2005 application for a temporary restraining order) that respondent told her he had killed several people in the past and described ways he imagined killing Lamb. The others are incidents appellant described in the parent questionnaire for the custody evaluation: an occasion during her relationship with respondent when he grabbed her arm "very hard" and pushed her back into a chair as she was trying to get up; one shortly after S.S. 's birth in which he threatened to "eliminate" her if she was a problem between him and his daughter; and another in 2008 when he "suddenly . . . grabbed [her] breasts."

33

of proof to the court.[27]

Appellant's claims that Judge Tang ignored evidence of physical abuse postdating August 2012 are not persuasive. Appellant refers first to the photographs of the rashes S.S. suffered in December 2013. Judge Tang described these as "serious rashes," but there is nothing in the record demonstrating they were evidence of sexual abuse. While vaginitis (the condition with which S.S. was diagnosed) may be consistent with sexual abuse, as appellant assumes, there is nothing in the record to suggest this is necessarily or even most likely the cause of the condition, and no indication the doctors who diagnosed the child viewed it as such.[28] The same is true with respect to the second piece of evidence appellant highlights, the diagnosis of vaginitis reflected in the report from the November 2013 emergency room visit. The investigation that followed the November

---

[27] As indicated above, appellant's described Dr. Saleem's expected testimony in general terms. In objecting to the court's ruling about domestic violence evidence, appellant stated, "I believe it's very relevant because a past behavior shows future— predicts future behavior." She did not alert the court, however, that she could offer expert testimony on this point.

[28] Appellant emphasizes that Judge Tang advised her to destroy these pictures, apparently suggesting the judge wanted to hide evidence of abuse—a point she argued explicitly with reference to the judge asking why appellant did not ask the emergency room personnel not to call the police after the doctors diagnosed S.S. with vaginitis on November 10, 2012. In this latter exchange, Judge Tang asked who called the Marin police inspector; appellant replied that it was either CASARC or the hospital; Judge Tang asked why appellant pursued the investigation; and appellant responded that she did not pursue it and actually wanted to take S.S. home, but it was "automatic procedure" for the hospital to call. Appellant's characterization of this exchange as Judge Tang asking "why she did not try to cover up possible sexual abuse during the SFGH visit" is not supported by the record. Regarding the photographs, appellant asked for the photographs to be admitted as evidence "of how our daughter is being returned to me" and respondent objected that it felt "obscene that my children's private parts are a part of this public court documentation." The court looked at the photographs and returned them to appellant, saying, "I agree with [respondent]. They shouldn't leave your hands; all right? This is very private, and I think you should . . . sooner than later destroy them so that they will not be kept anywhere. . . . I've reviewed them, and so they've been deemed admitted into evidence." The court then described the "very serious rashes" shown in the photographs. It is apparent that the court's concern was not to avoid evidence of abuse but to protect S.S. 's privacy.

34

incident was triggered by appellant's account of S.S. 's statements, not the vaginitis diagnosis. Appellant also points to the photographs of respondent "holding his naked children in inappropriate ways and bathing them at inappropriate ages." Our review of these photographs supports the trial court's finding that "[n]one of the pictures showed [respondent] engaging in any inappropriate touching of any of his children."

Appellant further contends certain of the court's findings were not supported by the evidence. The first of these has some degree of merit. The court found that the November 10, 2012 emergency room incident "provides solid medical evidence that [respondent] did not pinch S.S. 's vagina as alleged. Dr. David Becker, S.S. 's pediatrician, who examined her, opined that there was no evidence that S.S. 's vagina was ever pinched." The reference to Dr. Becker is presumably an error, as it was Dr. von Franque at Kaiser who examined S.S. after this incident. Dr. von Franque reported a "normal" examination with no indication of trauma, but this can be taken as evidence S.S. was not pinched only if physical evidence of pinching would be expected to be present several days after the fact. There was no evidence this was the case, and the report made no specific finding of no pinching.

The Statement of Decision goes on to say that appellant's denial of a "visual examination of S.S. 's vagina by the doctor in the emergency room when evidence would have been fresh and available to either prove or disprove allegations of sexual molestation gives pause to this court as to [appellant's] credibility in raising these molestation allegations." Appellant challenges this statement because she *did* allow visual examination by the doctors who diagnosed vaginitis. But the court was apparently referring to appellant's refusal to subject S.S. to a further forensic examination as requested by Detective Mather.

Appellant takes issue with Judge Tang's statement that appellant's testimony indicated she coached S.S. to describe inappropriate sexual conduct. The Statement of Decision reads, "[Appellant] denies any coaching. But her testimony indicates otherwise. [Appellant's] use of a party favor as a prop simulating a man's penis while querying S.S. about [respondent's] possible inappropriate conduct, is an inducement for a child to tell a

35

story that may not be true. [Appellant] testified S.S. was giggling when [appellant] asked [S.S. ] to demonstrate on a prop how [respondent] touched himself. [Appellant's] demeanor on the stand appeared more like describing a bonding moment between mother and daughter rather than a horrific act committed by [respondent]."[29]

Appellant would have us strike this "finding" because no expert opined that she coached S.S. or that a prop could influence a child to tell an untrue story. But Judge Tang concluded nothing requiring expert opinion. As appellant recognizes, there was no actual finding that she coached S.S. ; there was a common sense observation, based on what was described and appellant's demeanor in describing it, that questioning in this particular manner could induce a false report. Even from the cold record, appellant's testimony reads as Judge Tang described—a child's playful moment with her mother. In any event, this was one of a number of examples the court related to support the ultimate conclusion that appellant was continuing to refuse to accept evidence that her suspicions were unfounded.

Lastly, appellant contests the court's statement that "S.S. 's biggest challenge at this moment in her life is how to overcome the emotional damages resulting from '. . . *mother's long history of questioning S.S. which has led to S.S. 's inability to tell factual from fictitious events, the emotional damage her questioning may have caused and mother's less capable limit setting and boundary issues . . .*' (Child Custody Evaluation by Rhonda Barovsky, pg. 61)." Regarding the " 'long history of questioning,' " appellant

---

**[29]** At issue were the July 22, 2012, statements that led to the initial CPS investigation. At trial, in questioning appellant, respondent tried to show that she embellished her allegations as time went on, stating that she did not mention a prop in her initial description of S.S. 's statement but added this in her description to the court in October. Appellant explained that her journal entry at the time "implied" that a prop was used and her October description made this explicit. She testified that when S.S.said respondent and Gabriel touched each other and "showed [appellant] how by gently slapping the top and the bottom of the penis head," appellant gave S.S.a party blower and told her "[l]et's say this is . . . their pimpie." Appellant continued, "She was totally like giggling, like 'hee hee hee.' It was all so fun. You know, she was like—she puts it like—I just give it to her like this. Like this; right. She puts it here to her privates, and she goes 'ha ha ha.' And then did like this. I remember it very clearly."

states that Barovsky "admitted at trial that she fabricated a history from a few journal entries over a two-year period." The specific record citation appellant provides does not support her assertion. At the point cited, Barovsky only testified, "Well, starting at the time S.S. was two, every time she came back from a visit with you, mother asked her leading questions and suspicious questions." Barovsky, at a different point, did state her assumption that appellant asked questions beyond those written in her journal, testifying that "the journal is only what you've written down of what you've asked her" and "we have to assume that . . . there are other questions that you . . . have asked but you haven't written everything down." There was no admission of fabrication of a history, rather an opinion about the extent and tenor of appellant's questioning based on what appeared in the journal.[30]

Regarding S.S. 's ability to tell fact from fiction, appellant states that the only evidence at trial was that the child *is* able to make the distinction, as indicated in both Barovsky's report and that of CPS. The relevant point was not that S.S. was unable to distinguish fact from fiction in general but that she was not able to do so specifically with respect to molestation. As appellant points out, Barovsky herself established in her sessions with S.S. that S.S. knew the difference between truth and lies and between "real" and "fake" as a general matter. But Barovsky believed it likely that appellant had "unconsciously and unwittingly encouraged S.S.to believe that her father has harmed her by her constant questioning S.S. about her father" and that S.S. had "come to believe that her father has hurt her because her mother has discussed it with her so frequently for the past two years that she cannot tell the difference between actual events and fictitious

---

[30] Barovsky viewed appellant's journal as documenting appellant having questioned S.S."almost to the point of interrogating" the child after time spent with respondent. Lehmer testified that in her experience, it was not unusual for parents in highly contested custody situations to keep records of "day-to-day events," Lehmer also testified that Barovsky mentioned the journal as part of the basis for her impression that appellant had obsessive compulsive disorder, and that nothing in appellant's psychological testing suggested obsessive compulsive disorder. The extent to which these matters impeached the credibility of Barovsky's report was for Judge Tang to determine.

events." In so stating, Barovsky was not contradicting herself; she was making a point specific to the issue of molestation.

## IV.

On October 15, respondent filed a motion for attorneys' fees and costs in the amount of $27,237. Respondent summarized the components of his request as $19,608 for one of his attorneys, $4,787 for another attorney, $1,000 for his portion of the cost of Barovsky's evaluation, and $2,500 for Barovsky's witness fee. The court awarded respondent $2,429 in attorney fees.

Appellant contends the court should not have awarded the fees because respondent's motion was not timely filed and failed to comply with rule 5.427(b) of the California Rules of Court,[31] which specifies the documents that must be submitted with a request for attorneys' fees and costs.

Appellant urges the fee request was untimely under rule 3.1700(a)(1). This rule, entitled "Prejudgment Costs," requires a prevailing party claiming costs to serve and file a memorandum of costs within 15 days after service notice of entry of judgment or within 180 days after entry of judgment, whichever is first. Attorney fees are "allowable as costs" when authorized by contract, statute or law. (Code Civ. Proc., § 1033.5, subd. (a)(10).) Here, the clerk served the Statement of Decision on September 4, 2013, and respondent motion was not filed until October 15.

Under rule 3.1702, however, "[a] notice of motion to claim attorney's fees for services up to and including the rendition of judgment in the trial court . . . must be served and filed within the time for filing a notice of appeal under rules 8.104 and 8.108" —as relevant here, within 60 days of service of notice of entry of judgment or 180 days after entry of judgment. (Rule 3.1702(b)(1).) Rule 3.1702 is entitled "Claiming attorney's fees" and applies "[e]xcept as otherwise provided by statute, . . . in civil cases to claims for statutory attorney's fees and claims for attorney's fees provided for in a contract." (Rule 3.1702(a).)

---

[31] Further references to rules will be to the California Rules of Court.

38

Rules 3.1700 and 3.1702 thus "establish distinct procedures for asserting and contesting claims within their scope:  whereas the former rule imposes relatively brief periods for the filing of a memorandum of costs and motion to tax costs, the latter rule affords a much longer period for the filing of a motion for attorney fees in unlimited civil actions."  (*Kaufman v. Diskeeper Corp.* (2014) 229 Cal.App.4th 1.)  *Kaufman* addressed the question whether a request for contractual attorney fees under Civil Code section 1717 required the filing of a memorandum of costs, as required by rule 3.1700 but not rule 3.1702.  The court concluded that rule 3.1702 applied for a number of reasons, including that the rule unambiguously so stated ("[e]xcept as otherwise provided by statute, this rule applies in civil cases to claims for . . . attorney's fees provided for in a contract") and that "maxims of interpretation dictate that the particular or specific rule takes precedence over the general rule."  (*Kaufman*, at p. 10.)  The same is true with respect to the different time limits imposed by these rules.  Respondent's motion was timely filed under rule 3.1702.

Appellant points out, correctly, that respondent's motion did not comply with the requirements of rule 5.427 in that it did not include the "*Request for Attorney's Fees and Costs Attachment* (form FL-319) or a comparable declaration that addresses the factors covered in form FL-319" (rule 5.427(b)(1)(B)) or the "personal declaration in support of the request for attorney's fees and costs, either using *Supporting Declaration for Attorney's Fees and Costs Attachment* (form FL-158) or a comparable declaration that addresses the factors covered in form FL-158" (rule 5.427(b)(1)(D)).  Respondent discussed the grounds for his request in his motion, which was not filed under penalty of perjury, but submitted no declaration; and his motion did not address several of the issues specified in rule 5.427(b)(2), including his attorneys' experience and the billing rate for his primary attorney.[32]

---

[32]  Rule 5.427(b)(1) provides that except as provided in Family Code section 2031, subdivision (b), "to request attorney's fees and costs, a party must complete, file and serve the following documents:  [¶] (A) *Request for Order (form FL-300)*; [¶] (B) *Request for Attorney's Fees and Costs Attachment* (form FL-319) or a comparable

The trial court was obviously aware of these deficiencies, which were discussed in appellant's opposition, yet it ruled on the request. The court's order does not explain its reasoning, nor was it required to do so. (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 67.) The record does not include a transcript of the hearing. Because appealed judgments and orders are presumed correct, it is appellant's burden to affirmatively demonstrate error and to provide an adequate record to demonstrate error. (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502; *Bennett v. McCall* (1993) 19 Cal.App.4th 122, 127; see, *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.) Following the presumption that the trial court properly discharged its duty in ruling on the fee request (Evid. Code, § 664), we presume the court had a reason for excusing respondent's procedural noncompliance. Appellant offers no authority for her apparent assumption that failure to comply with the procedural requirements of rule 5.427 necessarily requires reversal of the fee award.

**DISPOSITION**

The trial court erred in two respects: It erroneously believed a prior judicial determination had been made concerning the allegations of sexual abuse, and it failed to address the requirement of changed circumstances to modify a permanent custody order. Because the former error amounted to denial of due process, appellant must be afforded the right she was denied to challenge the investigation of abuse predating the August 2012 temporary custody order, and any decision changing the preexisting permanent custody order must explain the changed circumstances justifying the change.

---

declaration that addresses the factors covered in form FL-319; [¶] (C) A current *Income and Expense Declaration* (form FL-150); [¶] (D) A personal declaration in support of the request for attorney's fees and costs, either using *Supporting Declaration for Attorney's Fees and Costs Attachment* (form FL-158) or a comparable declaration that addresses the factors covered in form FL-158; and [¶] (E) Any other papers relevant to the relief requested." Rule 5.427(b)(2) provides that "[t]he party requesting attorney's fees and costs must provide the court with sufficient information about the attorney's hourly billing rate; the nature of the litigation; the attorney's experience in the particular type of work demanded; the fees and costs incurred or anticipated; and why the requested fees and costs are just, necessary, and reasonable."

40

We reiterate, however, that although we conclude reversal is required, we do so reluctantly, recognizing the turmoil the parties' litigation has created in their lives and S.S. 's virtually since the child was born. Accordingly, any retrial of this matter should be as limited as is consistent with due process. At the same time, as always in child custody appeals, much time has passed and the trial court will have to determine the best interests of the child as of the date of **a** new hearing on permanent custody. (*Burchard*, *supra,* 42 Cal.3d at p. 541; *Carney, supra,* 24 Cal.3d at p. 741; *In re Marriage of Russo* (1971) 21 Cal.App.3d 72, 93-94.) Given the child's obvious need for resolution, we trust that the parties will act with dispatch if they choose to pursue further litigation of this matter, and that the trial court will handle any such litigation expeditiously.

The custody order is reversed and the matter remanded for proceedings consistent with the views stated in this opinion.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.